EXL Q

*Thomas M. Dailey, P. A.*
Suite 800
*3500 Willow Lake Boulevard*
*Vadnais Heights (St. Paul), Minnesota 55110 U.S.A.*
*Telephone: 651 / 490 - 9078*
*Facsimile: 651 / 490 - 1580*
*E-Mail: tdailey@klaw.us*

December 16, 2005

Mr. Frederic W. Knaak
15 Hawthorne Court
North Oaks, Minnesota 55127

Re:   Proposed Revocation of the Sale of your Shareholding in Ancona Title Services,
      Corporation, a federal and MN "s" corporation ("Ancona Title")

Dear Fritz:

I this will confirm several baseline considerations that you should keep in mind upon review of this subject and any documents prepared to memorialize an agreement to proceed. These are based, in large part, upon information furnished by Mr. Brent Olson, CPA, who has previously furnished professional accounting services to Ancona Title.

The MEMORANDUM OF UNDERSTANDING AND CONTRACT FOR SALE OF SHARES AND ASSETS AND INDEMNIFICATION AGREEMENT bearing date of August 19, 2005 and the separate Promissory Note dated July 25, 2005 both reflect the intended acquisition of your sole shareholding in Ancona Title by Ancona Escrow, Inc. ("Ancona Title") which, according to your understanding, was then and is a registered "s" corporation. You have informed us that your accommodation of these particular purchase arrangements was personally requested by Mr. Brown, indicated to be the President of (and a shareholder in) Ancona Escrow.

As you know, federal law (the Internal Revenue Code) predicates "s" corporate status upon shareholding by natural persons only. Corporations are ineligible shareholders in "s" corporations. Thus, upon payment by Ancona Escrow, from its funds, for any of your common voting shares in Ancona Title, the "s" election previously made and in effect for the latter became subject to automatic termination with resulting reclassification as a "C" corporation, in which Ancona Escrow can validly hold voting shares. That reclassification could have been forestalled only by a filing with the IRS, under Form 8889, of a further election of "subsidiary" status for a wholly stock-acquired "s" pending its assimilation by the acquiring other corporation. But such election must be made promptly; i.e., within 2½ months of the date of purchase of the "s" corporation stock. The making of that election, timely and in good form, would have been the responsibility of Ancona Escrow and Mr. Brown, and failure to make it would cause reclassification of Ancona Title from "s" to "C" corporate status with attendant federal and state tax consequences.

If Mr. Brown and Ancona Escrow made and filed the "subsidiary" election just discussed (and I assume that you would want Mr. Olson to verify that with the IRS), then you will want to inquire into the status of its associated assimilation of Ancona Title's assets and of the

SCANNED
FEB 0 6 2006
U.S. DISTRICT COURT MPLS

Mr. Frederic W. Knaak
December 16, 2005
Page 2

assimilation has occurred, then that could impede a simple revocation and likely require itemization, revaluation and a sale-back of the related assets from Ancona Escrow to Ancona Title; that is, assuming that the assimilation allowed by the "subsidiary" election under the IRC can be stopped.

If Mr. Brown and Ancona Escrow did not timely make and file the interim "subsidiary" election, then Ancona Title will now be a "C" corporation and its net income subject to federal and state taxes (e.g., at the federal rate of 15 % on the first $ 50,000). In that event, two different tax returns would now be due for Ancona Title for calendar 2005; a stub year "s" return through July 25 (date of note) or August 19th, which ever is considered appropriate under applicable accounting rules, and another "C" return from the following day through the end of this month and calendar year with tender of corporate income taxes computed to be due.

Perhaps more importantly, reclassification of Ancona Title from "C" status back to "s" status could not be accomplished by the simple revocation of your sale of shares to Ancona Escrow. Under the IRC, such elective change of status back to "s" cannot be made within 5 years of that triggering transaction unless, perhaps, permitted by the IRS under a Private Ruling. While both Mr. Olson and I share a doubt that the IRS would issue a favorable ruling (and allow a reinstatement election) under the facts of this case, the application cost and delay of receiving an uncertain decision don't do much to assist your deliberations at this point.

In summary, Mr. Olson and I see the viability of revocation as being driven largely by the confirmed, current tax status of Ancona Title ("s" or "C"). Such change in status would not necessarily impede some alternate arrangements, but it would certainly raise issues of future financial impact and operating change that could exaggerate back-transfer preparations and reparations, asset tracing, suitable documentation, and accountancy charges. Mr. Olson appears to have a good early view of what you might expect in those regards, and I invite you to contact him if you wish to discuss those matters and others outlined above.

Confirming an additional matter, I do not see a revocation or other reinstatement of Ancona Title in you as a single-event transaction. Rather, I see is as a phased process involving (1) documented agreement on what is to be done with schedule for accomplishment, (2) a period in which those things are actually done or found to be hindered, and (3) a closing meeting and final pay-off at which adjustments arising in the middle part are duly accounted for with reasonable values assigned.

Very truly yours,

*Thomas M. Dailey, P.A.*

Thomas M. Dailey

cc:   Mr. Brent Olson

### Froehle, Wendy

**From:** Magnuson, Kevin
**Sent:** Wednesday, December 28, 2005 6:40 PM
**To:** 'Fritz Knaak'
**Cc:** 'Chris Brown'; Tilton, Philip; McDonough, Brigid; Duffy, James; McEllistrem, Michael
**Subject:** Tax consequences of rescission

Fritz:

As we discussed on the phone yesterday, I had a couple of our tax lawyers review the issue of whether rescission in 2005 of the purchase agreement for Ancona Title would affect the original tax status of the company. I forwarded the December 16, 2005 letter of Mr. Dailey regarding this subject to our tax lawyers and received the attached memorandum, which sets forth the principles of rescission for tax purposes and attaches an IRS Revenue Ruling and an IRS private letter ruling specifically applying rescission principles to an S corporation. This opinion is legal advice to my client only and does not constitute legal advice to you. However, it provides you with information that should enable your advisers to reach an independent opinion contrary to that currently expressed by Mr. Dailey. The bottom line is that there is good authority establishing that rescission in the same year in which the transaction occurred will not change the tax status of Ancona Title. However, the rescission agreement and the exchange of monies should take place prior to the end of 2005 if you wish to maintain subchapter S tax status for Ancona Title after rescission.

Please review the attached memorandum and IRS documents and let me know if this changes your position regarding the rescission agreement I sent you December 7, 2005. If you refuse to follow through in 2005 with our settlement agreement to rescind the purchase agreement, you will not be able to rely on the argument that delayed rescission in 2006 changes the tax status of Ancona Title such that rescission is no longer an inequitable remedy. I think we have demonstrated that your tax objections to rescission are misplaced.

Please do not hesitate to call me to discuss this matter. I expect that we will have a rescission transaction completed by the end of this year.

THE ATTACHED MEMORANDUM DOES NOT CONSTITUTE A LEGAL OPINION ON WHICH YOU MAY RELY. YOU SHOULD OBTAIN AN INDEPENDENT LEGAL OPINION. THIS DISCLOSURE IS NOT A WAIVER OF THE ATTORNEY-CLIENT OR ATTORNEY WORK PRODUCT PRIVILEGE.

Kevin M. Magnuson
Briggs and Morgan P.A.
2200 IDS Center
Minneapolis, Minnesota 55402-2157
(612) 977-8438 (direct)
(612) 977-8650 (FAX)

Any U.S. Federal tax advice contained in this communication (whether distributed by mail, email or fax) is not intended or written to be used, and it cannot be used by any person for the purpose of avoiding U.S. Federal tax penalties or for the purpose of promoting, marketing or recommending any entity, investment plan or other transaction. (The foregoing legend has been affixed pursuant to U.S. Treasury Regulations governing tax practice.)

1/4/2006

# MEMORANDUM

**TO:**     Kevin Magnuson (w/attachments)

**CC:**     James Duffy (w/attachments)

**FROM:**   M. Brigid McDonough, Esq.

**DATE:**   December 28, 2005

**RE:**     **Ancona Title**

---

In Private Letter Ruling 200533002, dated August 19, 2005, the IRS ruled that a corporation would be treated as an S corporation during the period between the time of a disqualifying sale of stock and the rescission of the transaction. It further ruled that the original shareholders would be treated as the shareholders of the corporation for the period between the sale and the rescission. This ruling was based on Rev. Rul. 80-58, 1980-1 C.B. 181.

The Internal Revenue Service has consistently recognized that a rescission "may be given full effect in abrogating a transaction under certain conditions." PLR. 200533002. When these conditions are met, the transaction is disregarded for federal income tax purposes. Id.

In Rev. Rul. 80-58, 1980-C.B. 1981, the Internal Revenue Service stated that at least two conditions must be satisfied for the remedy of rescission to apply to disregard a transaction for federal income tax purposes:

1.  The Parties to the transaction must return to the status quo before the transaction took place, i.e. "they must be restored to the 'relative positions they would have occupied had no contract been made."

2.  This restoration must be achieved within the taxable year of the transaction.

In PLR 200533002, X Corporation was incorporated under the laws of State M in Year 1 and made an S election effective Year 1. X's original shareholders were A, B, C, Trust 1 and Trust 2. In Year 2, X entered into discussions with Fund, a venture capital fund, for the sale of X stock to Fund. In Year 2, X sold shares of newly issued convertible preferred X stock to LP1, LP2 and LP3 (the "Partnerships"), three limited partnerships controlled by Fund. This terminated X's S election under I.R.C. § 1362(d)(2), because X no longer met the definition of a small business corporation as defined by I.R.C. § 1361(b)(1).

In the months following the sale, disagreements arose between the original X shareholders and the Partnerships. As a result of these disagreements, X and the Partnerships agreed to unwind the original purchase. X and the Partnerships entered into a Stock Rescission Agreement which was consummated in the same taxable year as the sale of the stock to the Partnerships. The terms of the agreement provided as follows:

1858209v1

1.  X would remit the original purchase price of the preferred stock to the Partnership;

2.  Upon execution of the agreement and delivery of the purchase price, the issuance of the convertible preferred stock would be deemed rescinded.

3.  X would promptly cancel the issuance of the convertible preferred stock.

4.  The Stock Rescission Agreement provided for the release of all parties from any liability or obligation that arose from the original Stock Purchase Agreement with the exception that the indemnification clauses for the Partnerships and their representative remained in effect.

5.  X represented that during the period the Partnership held stock in X, no distributions had been made to the Partnerships.

Based upon the rules set forth in Rev. Rul. 80-58, the Service found that X, A, B, C, Trust 1, Trust 2, LP1, LP2 and LP3 were restored to the relative positions they would have occupied if the X stock had never been sold to the Partnerships. Additionally, this restoration was achieved within the same taxable year. Therefore, the legal doctrine of rescission applied with the following results:

(1) The creation of convertible preferred stock and X's issuance of that stock to the Partnerships was disregarded; and

(2) The rescission prevented the termination of X's S corporation status for the entire Year 2.

If the rescission agreement is executed in 2005 and the parties are returned to the status quo before the sale took place, the principles in Rev. Rul. 80-58 would applied to the original Ancona Title sale. As a result, the sale of Ancona Title Services stock to Ancona Escrow would be disregarded, and Ancona Title's S corporation status would not have terminated during 2005.

The analysis set forth in Mr. Dailey's December 16, 2005 letter does not take into consideration the tax rules for rescission of a transaction in the same taxable year. Contrary to the discussion in that letter, if a true rescission takes place in 2005, there would have been no change in the S status of Ancona Title and that corporation would not have had its S election terminated and it would remain an S corporation throughout all of 2005.

I have attached Rev. Rul. 80-58 and PLR 200533002 to this memorandum.

me

2

1858209v1

Rev. Rul. 80-58, 1980-1 CB 181 -- IRC Sec(s). 1001
Revenue Rulings (1954 - Present)

Revenue Rulings

# Rev. Rul. 80-58, 1980-1 CB 181, IRC Sec(s). 1001

## Headnote:

**Rev. Rul. 80-58, 1980-1 CB 181 -- IRC Sec. 1001** (Also Sections 61, 1038; 1.61-6, 1.1038-1.)

*Reference(s):* Code Sec. 1001; Reg § 1.1001-1

Reconveyance of real property to seller.

No gain is recognized under section 1001 of the Code on the sale of land by a taxpayer who accepts reconveyance of the land and returns the buyer's funds in the taxable year of the sale. If the reconveyance occurs after the taxable year of sale, the seller reports the sale in the taxable year of sale and acquires a new basis in the property when it is reconveyed equal to the amount paid for the reconveyance.

## Full Text:

### ISSUE

In the situations described below, what are the federal income tax consequences of a reconveyance to a taxpayer of property previously sold by the taxpayer?

### FACTS

*Situation 1:* In February 1978, A, a calendar year taxpayer, sold a tract of land to B and received cash for the entire purchase price. The contract of sale obligated A, at the request of B, to accept reconveyance of the land from B if at any time within nine months of the date of sale, B was unable to have the land rezoned for B's business purposes. If there were a reconveyance under the contract, A and B would be placed in the same positions they were prior to the sale.

In October 1978, B determined that it was not possible to have the land rezoned and notified A of its intention to reconvey the land pursuant to the terms of the contract of sale. The reconveyance was consummated during October 1978, and the tract of land was returned to A, and B received back all amounts expended in connection with the transaction.

*Situation 2:* Same as above, except that the period within which B could reconvey the property to A was one year. In January 1979, B determined that it was not possible to have the land rezoned and notified A of its intention to reconvey the land pursuant to the terms of the contract of sale. The reconveyance was consummated during February 1979, and the tract of land was returned to A. B received back all amounts expended in connection with the transaction.

### LAW AND ANALYSIS

Section 61(a)(3) of the Internal Revenue Code provides that, except as otherwise provided, gross income means all income from whatever source derived, including gains derived from dealings in property.

Section 1001(c) of the Code provides that, except as otherwise provided, the entire amount of gain or loss, determined under section 1001, on the sale or exchange of property shall be recognized.

The legal concept of rescission refers to the abrogation, canceling, or voiding of a contract that has the effect of releasing the contracting parties from further obligations to each other and restoring the parties to the relative positions that they would have occupied had no contract been made. A <Page 182> rescission may be effected by mutual agreement of the parties, by one of the parties declaring a rescission of the contract without the consent of the other if sufficient grounds exist, or by applying to the court for a decree of rescission.

The annual accounting concept requires that one must look at the transaction on an annual basis using the facts as they exist at the end of the year. That is, each taxable year is a separate unit for tax accounting purposes. See *Security Flour Mills Co. v. Commissioner,* 321 U.S. 281 (1944), Ct. D. 1603, 1944 C.B. 526.

In *Penn v. Robertson,* 115 F.2d 167 (4th Cir. 1940), the taxpayer was a participant in an employees' stock benefit fund created by the directors of the company without the approval of the shareholders. Under the plan the taxpayer was credited with earnings from the fund for the years 1930 and 1931. In 1931, as a result of suits filed by a shareholder, the directors of the company passed a resolution whereby the plan would be rescinded as to all participants in the plan who agreed to relinquish their previous credits and rights. The United States Court of Appeals held that although the plan was rescinded for 1930, the annual accounting period principle required the determination of income at the close of the taxable year without regard to subsequent events. That is, the rescission in 1931 was disregarded for purposes of determining 1930 taxable income.

With regard to whether the 1931 income should be taxed, the Court of Appeals said in the *Penn* case that the rescission in 1931 extinguished what otherwise would have been taxable income for that year.

The facts of the *Penn* case are similar to those in *Situation 1* and *Situation 2.* In *Penn,* earnings were credited in 1930 and 1931 and there was a rescission in 1931 (that was intended to affect both years). *Situation 1* relates to the earnings credited in 1931, the year of the rescission; and *Situation 2* relates to the earnings credited in 1930, that is, a year different from the year of the rescission.

In *Situation 1* the rescission of the sale during 1978 placed A and B at the end of the taxable year in the same positions as they were prior to the sale. Thus, in light of the *Penn* case, the original sale is to be disregarded for federal income tax purposes because the rescission extinguished any taxable income for that year with regard to that transaction. See Rev. Rul. 74-501, 1974-2 C.B. 98, which holds that there is no adjustment to the basis of the old stock where a shareholder exercised stock rights and paid the subscription price for the new stock, which subscription price was later returned to the shareholder in the same taxable year in which the rights were issued because the market price of the stock had depreciated to a price below the subscription offer.

In *Situation 2,* as in *Situation 1,* there was a completed sale in 1978. However, unlike *Situation 1,* because only the sale and not the rescission occurred in 1978, at the end of 1978 A and B were not in the same positions as they were prior to the sale. Again, in light of the *Penn* case, the rescission in 1979 is disregarded with respect to the taxable events occurring in 1978.

In both situations, the annual accounting period principle requires the determination of income at the close of the taxable year without regard to subsequent events.

## HOLDINGS

In *Situation 1,* no gain on the sale will be recognized by A under section 1001 of the Code.

In *Situation 2,* A must report the sale for 1978. In 1979, when the property was reconveyed to A, A acquired a new basis in the property, which was the price paid to B for such reconveyance.

See section 1038 of the Code for treatment of reacquisition of real property where a secured indebtedness to the original seller is involved.

PLR 200533002 -- IRC Sec(s). 1362, 08/19/2005
Private Letter Rulings & Technical Advice Memoranda (1953 - Present)

**Private Letter Rulings**

# Private Letter Ruling 200533002, 08/19/2005, IRC Sec(s). 1362

**UIL No.** 1362.00-00

## S corps.—termination of S election..

## Headnote:

Corp. that lost its S status due to no longer meeting definition of small business corp., will continue to be treated as S corp. during stated period from and thereafter, provided that corp.'s S election was valid and not otherwise terminated under Code Sec. 1362(d); .

*Reference(s):* Code Sec. 1362;

## Full Text:

Release Date: 8/19/2005

Date: April 28, 2005

Refer Reply To:

CC:PSI:2 - PLR-103413-05

Person To Contact:

Number:

## LEGEND:

$\underline{X}$ =

$\underline{A}$ =

$\underline{B}$ =

$\underline{C}$ =

Trust 1 =

Trust 2 =

Fund =

LP1 =

LP2 =

LP3 =

d1 =

d2 =

d3 =

State =

n =

$a =

Dear [Redacted Text]

This responds to a letter dated January 13, 2005, submitted on behalf of X by its authorized representative requesting a ruling on the status of X's S election.

The information submitted states that X was incorporated under the laws of State on d1 and made an S election effective d [1]. X's original shareholders were A, B, C, Trust 1 and Trust 2. Subsequently, X entered into discussions with Fund, a venture capital fund, for the sale of X stock to Fund. On d2, X sold n shares of newly issued convertible preferred X stock to LP1, LP2 and LP3 (the Partnerships), three limited partnerships controlled by Fund, for $a. This terminated X's S election under § 1362(d)(2) of the Internal Revenue Code because X no longer met the definition of a small business corporation as defined by § 1361(b)(1).

In the months following the sale, disagreements arose between the original X shareholders and the Partnerships. These disagreements led X and the Partnerships to agree to unwind the original purchase. X and the Partnerships entered into a Stock Rescission Agreement which was consummated as of d3, which date was in the same taxable year as d2. The terms of the agreement provide that X remit $a to the Partnerships. Upon the execution of the agreement and delivery of the $a, the issuance of the convertible preferred stock would be deemed rescinded. The agreement requires that X promptly cancel the issuance of the convertible preferred stock. The agreement provides for the resignation of the Partnerships' representative from X's Board of Directors. The agreement also releases all parties from any liability or obligation that arose from the original Stock Purchase Agreement with the exception that the indemnification clauses for the Partnerships and their representative remain in effect. X represents that during the period from d2 to d3, X did not make any distributions to the Partnerships.

Section 1361(a) provides that the term "S corporation" means, with respect to any taxable year, a small business corporation for which an election under § 1362(a) is in effect for such year.

Section 1361(b) provides that the term "small business corporation" means a domestic corporation which is not an ineligible corporation and which does not (A) have more than 100 shareholders, (B) have as a shareholder a person (other than an estate, a trust described in § 1361(c)(2), or an organization described in § 1361(c)(6)) who is not an individual, (C) have a nonresident alien as a shareholder, and (D) have more than 1 class of stock.

Section 1362(d)(2)(A) provides that an election under § 1362(a) will be terminated whenever (at any time on or after the 1st day of the 1st taxable year for which the corporation is an S corporation) such corporation ceases to be a small business corporation.

The Service recognizes that a rescission may be given full effect in abrogating a transaction under certain conditions.

When these conditions are met, the transaction is disregarded for federal income tax purposes. In this connection, Rev. Rul. 80-58, 1980-C.B. 181, states the general legal principles pertaining to the doctrine of rescission in the following terms:

> The legal concept of rescission refers to the abrogation, canceling, or voiding of a contract that has the effect of releasing the contracting parties from further obligations to each other and restoring the parties to the relative positions that they would have occupied had no contract been made. A rescission may be effected by mutual agreement of the parties, by one of the parties declaring a rescission of the contract without the consent of the other if sufficient grounds exist, or by applying to the court for a decree of rescission.

The revenue ruling states that there are at least two conditions that must be satisfied for the remedy of rescission to apply to disregard a transaction for federal income tax purposes. First, the parties to the transaction must return to the status quo ante; that is, they must be restored to "the relative positions they would have occupied had no contract been made." Second, this restoration must be achieved within the taxable year of the transaction.

X, A, B, C, Trust 1, Trust 2, LP1, LP2 and LP3 were restored to the relative positions they would have occupied if the X stock had never been sold to the Partnerships. In addition, this restoration was achieved within the same taxable year. Therefore, the legal doctrine of rescission applies to (1) disregard the creation of convertible preferred stock and X's issuance of that stock to the Partnerships, and (2) prevent the termination of X's S corporation status.

Based solely on the facts submitted and representations made, we rule that X will be treated as continuing to be an S corporation during the period from d2 to d3, and thereafter, provided that X's S election was valid and was not otherwise terminated under § 1362(d). We further rule that during the period from d2 to d3, A, B, C, Trust 1 and Trust 2 will be treated as the shareholders of X. Accordingly, A, B, C, Trust 1 and Trust 2 must include in income their pro rata shares of the separately and nonseparately stated items of X as provided in § 1366 and must make any adjustments to stock basis as provided in § 1367 and take into account any distributions made by X as provided in § 1368. This ruling is null and void if X, A, B, C, Trust 1 or Trust 2 fail to comply with these requirements.

Except as specifically set forth above, no opinion is expressed concerning the federal tax consequences of the facts described above under any other provision of the Code, including whether X was or is a small business corporation under § 1361(b).

The rulings contained in this letter are predicated upon facts and representations submitted by the taxpayer and accompanied by a penalty of perjury statement executed by the appropriate party. This office has not verified any of the material submitted in support of the request for a ruling. Verification of the factual information, representations, and other data may be required as part of the audit process.

This ruling is directed only to the taxpayer who requested it. Section 6110(k)(3) of the Code provides that it may not be used or cited as precedent.

Pursuant to a power of attorney on file with this office, a copy of this letter is being forwarded to X's authorized representative.

Sincerely,

J. Thomas Hines

Chief, Branch 2

Associate Chief Counsel

(Passthroughs and Special Industries)

Enclosures (2)

Copy of this letter

Copy for § 6110 purposes

<u>1</u>

C.B. 181, states the general legal principles pertaining to the doctrine of rescission in the following terms:

END OF DOCUMENT - © Copyright 2005 RIA. All rights reserved.

**Froehle, Wendy**

| | |
|---|---|
| **From:** | Fritz Knaak [fknaak@klaw.us] |
| **Sent:** | Thursday, December 29, 2005 9:21 AM |
| **To:** | Magnuson, Kevin |
| **Subject:** | Re: Tax consequences of rescission |

```
On Wed, 28 Dec 2005 18:39:48 -0600
 "Magnuson, Kevin" <KMagnuson@Briggs.com> wrote:
> Fritz:
>
> As we discussed on the phone yesterday, I had a couple of
> our tax
> lawyers review the issue of whether rescission in 2005 of
> the purchase
> agreement for Ancona Title would affect the original tax status of the
> company.

I received your note and forwarded it to Dailey.  Might
have
been more useful even a couple of weeks ago.  As it is,
there
simply no way to get the deal together with due diligence
in
two days.

As I said, I'll have something to you next week.
Frederic W. "Fritz" Knaak
(Licensed in MN, WI & CO)
KNAAK & KANTRUD, P.A.
3500 Willow Lake Blvd., Suite 800
Vadnais Heights, MN  55110
Phone: 651/490-9078 - Fax: 651/490-1580
Mailto:fknaak@klaw.us - Web: www.klaw.us
```

This email has been scanned for all viruses by the MessageLabs SkyScan service.
(http://www.messagelabs.com)

1